**Kevin SULLIVAN, et al., Plaintiffs**

**v.**

**CITY OF SPRINGFIELD, Defendant.**

**C.A. No. 05–30004–MAP.**

United States District Court,
D. Massachusetts.

May 23, 2008.

Alfred Gordon, Harold L. Lichten, Pyle, Rome, Lichten & Ehrenberg, P.C., Boston, MA, for Plaintiffs.

Maurice M. Cahillane, Jr., Egan, Flanagan & Cohen, P.C., Peter M. Murphy,

Edward M. Pikula, Springfield, MA, for Defendant.

***MEMORANDUM AND ORDER RE-GARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION TO STRIKE DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT***

(Dkt. Nos. 27, 35, 38)

PONSOR, District Judge.

## I. INTRODUCTION

This is an action brought by five individuals, Kevin Sullivan, Vincent Dudley, Mark Mehringer, Jason Sleeper, and Michael Trombley, who were laid off from the Springfield Police Department in 2003. Plaintiffs allege that the City of Springfield discriminated against them by considering race when determining seniority for the purpose of effecting the 2003 layoffs. The court previously denied the parties' cross-motions for summary judgment because the data then before the court did not support a claim of racially discriminatory conduct on the part of Springfield. (Dkt. No. 23, Mem. and Order Regarding Cross-Motions for Summ. J. (Jan. 3, 2007) [*Sullivan* I].) Pursuant to the court's earlier order the parties have supplemented the record and again filed cross-motions for summary judgment. Additionally, Plaintiffs have moved to strike Defendant's motion for summary judgment on the ground that it was not timely filed.

After reviewing the augmented record and hearing argument from the parties on October 31, 2007, the court on March 28, 2008 issued a memorandum and order denying Plaintiffs' motion for summary judgement on two grounds: first, Plaintiffs have failed after several efforts to marshal adequate record support for their claims

and, second, the actions taken by Defendant in relation to Plaintiffs were reasonably required to comply with a controlling consent decree. At the same time, the court allowed Defendant's motion for summary judgment and denied Plaintiffs' motion to strike. In its brief March 28, 2008 memorandum, the court promised a lengthier explanation of its reasoning. This memorandum fulfills that promise.

## II. BACKGROUND

The events giving rise to this dispute are entwined with a complicated set of facts related to the consent decree entered more than thirty years ago in *Castro v. Beecher*, 365 F.Supp. 655 (D.Mass.1973). As the court's previous order reviewed the statutory and administrative framework governing the hiring of police officers in municipalities subject to the Commonwealth's civil service law, that framework will not be detailed here. (*Sullivan I* at 3–4.)

Plaintiffs argue that certain actions taken by the Springfield Police Department went beyond the *Castro* consent decree. In order to address that argument the court will review the background of the *Castro* decree in some detail, including an unpublished stipulation of facts contained in the court records from the initial action, attached hereto as Exhibit A. Because the parties have embraced the court's recitation of the facts underlying this case in *Sullivan I*, subject to some modifications based on additional discovery, the court will focus its review of the material facts on those additions, certain gaps remaining in the factual record, and specific aspects of the hiring process on which the court's decision is based. (Dkt. No. 28, Pls.' Memo. in Supp. of Their Substitute Mot. for Summ. J. 2 n. 1; Dkt. No. 37, Def.'s Memo. in Opp'n. to Pls.' Substitute Mot. for Summ. J. and In Support of Def.'s Cross–Mot. for Summ. J. 1–2.)

A. *The Castro Consent Decree.*

In the early 1970s six blacks and two Hispanics [1] brought suit against the commissioners and director of the Massachusetts Civil Service Commission [2] [hereinafter "HRD"] and the Commissioner of Police of the City of Boston, alleging that various eligibility requirements for police officer positions were racially discriminatory. *Castro v. Beecher,* 334 F.Supp. 930, 934 (D.Mass.1971) [*Castro I*]. At the time, the HRD was responsible for providing municipalities in Massachusetts with lists of individuals eligible for appointment as police officers. *Id.* at 937. In order to be eligible for appointment candidates had to take and pass a written exam of general knowledge, a physical fitness test, and a medical test, as well as meet other eligibility requirements related to citizenship, education, age, height, and moral character. Ex. A, Stipulations of Fact Relevant to Defs. Nancy Beecher, Joseph Duffy, Aaron Feinberg, Ernest Laflamme, Jr., Helen Mitchell, Members of the Massachusetts Civil Service Commission, and Def. Mabel Campbell, Dir. of Civil Service, *Castro v. Beecher,* No. 70–1220W (D.Mass. Apr. 23, 1971) [April 23, 1971 Stipulation] ¶¶ 113–14; *see also Castro I,* 334 F.Supp. at 937.

The HRD determined which applicants met the requirements and placed their names on an eligibility list. *Id.* Applicants were ranked by standing, except that all disabled veterans were moved to the top of the list, followed by non-disabled veterans, and then all other applicants. Ex. A, April 23, 1971 Stipulation ¶ 207; *see also, Castro I,* 334 F.Supp. at 937. Standing was based on an applicant's "total point score" on the examinations plus possible increases based on an applicant's previous training or experience. Ex. A, April 23, 1971 Stipulation ¶¶ 113–14. Eligibility lists expired two years after they were established and applicants were chosen from the oldest available eligibility list first. *Id.* ¶ 114. The HRD rules required, and still require, appointing authorities to select candidates for appointment in rank order from the eligibility lists. When an appointing authority bypassed a candidate in favor of a lower ranked candidate it was, and still is, required to provide the HRD with a written explanation for the deviation. *Id.* at ¶ 206; Dkt. No. 39, Ex. N, Personnel Administration Rules, PAR.08.

Of the several eligibility requirements challenged by the plaintiffs in *Castro,* the district court judge found that all but one were either not shown by the evidence to be discriminatory or were permissible because they were sufficiently related to the job requirements for law enforcement officials. The written exam, on which a passing score of 70 or better was required, was the lone exception. The court concluded that

> [i]nasmuch as the civil service examinations were not job related and were discriminatory against the plaintiffs, any state or city official, who innocently or otherwise, used the results of those examinations to deprive a plaintiff of a job

1. The terminology used to refer to the minority groups has evolved over time and the court therefore has several choices about how it refers to them. For the sake of consistency, the court follows Sullivan I and uses "blacks" instead of African–Americans and "Hispanics" in place of "Spanish-surnamed individuals." Additionally, "minority" refers only to the group comprised of blacks and Hispanics, while "non-minority" refers to the group comprised of individuals of all other races and ethnicities.

2. The Massachusetts Civil Service Commission has since become known as the Human Resources Division. For simplicity, the agency will be referred to as the HRD throughout.

opportunity deprived him of the equal protection of the laws. . . .

*Castro I*, 334 F.Supp. at 943.

The district court declined to certify the plaintiffs' requested class, though it prohibited the further use of existing exam results and ordered that future exams be both non-discriminatory and significantly related to job requirements and performance of police officers. The First Circuit reversed the district court on the class certification and remedy issues because "[t]he relief ordered by the district court [was] unlikely to increase significantly [the current] level of [minority] representation," which was then 2.3 percent. *Castro v. Beecher*, 459 F.2d 725, 730 (1st Cir.1972) [*Castro II* ]. On remand the First Circuit directed the district court to order "some form of compensatory relief" for class members and suggested that the relief include the establishment of priority pools to facilitate the hiring of qualified minority applicants. *Id.* at 736. Recognizing that any remedy affecting the way the HRD developed its eligibility lists would not be "fully effective without the cooperation of the appointing authorities in the various police forces," the First Circuit retained the Boston Commissioner of Police as a party. *Id.* at 737. The First Circuit did not seek to add any other appointing authorities as parties because it anticipated that these other appointing authorities would be just as willing to cooperate in efforts to diversify their departments. *Id.*

Following the *Castro II* remand, the parties entered into a consent decree (the "*Castro* decree"), which was approved by the district court in April of 1973. *Castro v. Beecher*, 365 F.Supp. 655 (D.Mass.1973) [*Castro III* ]. The decree required the HRD to change its recruitment program, report data about applications and employment to the plaintiffs' counsel, and ensure future exams were "validated in conformi-

ty with the Testing Guidelines of the Equal Employment Opportunity Commisssion." *Id.* at 662. Additionally, and relevant to this case, the decree altered the way the HRD would assemble the eligibility lists sent to appointing authorities.

The *Castro* decree created four groups of applicants. Within each group candidates would be "ranked in accordance with existing Massachusetts law." *Id.* at 661. Group A included minority candidates who took and failed the exams given in 1968–1970, but passed the exam given in 1972 and were "otherwise qualified for appointment." *Id.* Group B included all individuals who were on three eligibility lists as a result of passing exams between 1968 and 1970. *Id.* Each of the three lists was given an expiration date no more than approximately sixteen months from the entry of the decree. Group C included all minority candidates, not included in Group A, who took and passed the exam in 1972 and were "otherwise qualified for appointment." *Id.* Finally, Group D included anyone who passed the 1972 exam, was "otherwise qualified for appointment," and was not included in Groups A, B, or C. *Id.* The list of Group D candidates was set to expire two and a half years after the administration of a 1972 interim exam. *Id.*

When an appointing authority requested a list of eligible candidates the groups would be combined into a single list such that there would be "one candidate from Group A for every candidate certified from Group B" until Group A was exhausted. *Id.* At that point there would be "one candidate from Group C for every three candidates certified from Group B" until Groups B and C were exhausted. *Id.* Once Groups A, B, and C were exhausted, and as long as no more than two and a half years had passed since the 1972 exam, candidates from Group D could be certified. *Id.* Finally, in the event that a mu-

nicipality's appointing authority failed to offer an appointment to the next highest candidate certified from any of the groups, the order required the HRD to obtain a written statement explaining why the candidate was bypassed before the HRD could authorize any appointment. *Id.*

The initial *Castro* decree was revisited and amended in 1975 by Chief Judge Caffrey. *Castro v. Beecher*, 386 F.Supp. 1281, 1282 (D.Mass.1975) [*Castro IV*]. At that time, the district court issued an order clarifying the way that statutory preferences were to be handled under the *Castro* decree. *Id.* at 1286–87. The court also requested proposals from the parties to modify the consent decree to prevent the HRD from having to certify only minority candidates (Groups A and C) indefinitely following the expiration of Groups B and D. *Id.* at 1286. The district court suggested that the parties model their solution on the remedy adopted in a parallel case involving the hiring of firefighters, *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F.Supp. 507 (D.Mass.1974), *aff'd*, 504 F.2d 1017 (1st Cir.1974). *Id.* A revised decree was subsequently entered by the court. Ex. B, *Castro v. Beecher*, Nos. 70–1220–W, 74–2982–C (D. Mass. June 27, 1975) [June 27, 1975 Consent Decree].

As revised, the *Castro* decree provided for the continued use of minority and nonminority groups, at a ratio of one to one in Boston and Springfield and three to one in other municipalities, until the percentage of minorities in the police force was commensurate with the percentage of minorities in the community. *Id.* Over the years a number of municipalities reached the milestones for minority representation in their police forces and now no longer hire police officers in accordance with the *Castro* decree. *See e.g. Deleo v. City of Boston*, No. 03–12538–PBS, 2004 U.S. Dist. LEXIS 24034 (D.Mass. Nov. 23, 2004) (re-

leasing Boston from the *Castro* decree). The First Circuit has also rejected modifications of the *Castro* and *Beecher* decrees to address layoffs based on seniority, though it did so without ruling that such modification would have been unconstitutional. *Boston Chapter, NAACP v. Beecher*, 749 F.2d 102, 104 (1st Cir.1984) (distinguishing the case from *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984)).

### B. *Factual Overview of This Case.*

There are two time periods during which the events underlying Plaintiffs' discrimination claim in this case occurred. In 1996 Defendant began the process of hiring a new group of officers. That process continued through mid–1997 when seniority among the newly appointed officers was determined and badge numbers (which correlate with seniority) were assigned. This is the period during which Plaintiffs allege that Defendant impermissibly considered race. Later, in 2003 and 2004, Defendant carried out the layoffs and recalls that are the basis of Plaintiffs' claim that they were laid off earlier and recalled later than they should have been solely due to their race.

### 1. *1996–1997.*

### a. *Hiring Process.*

In 1996 Defendant decided to hire sixty new police officers, and the Police Commission Chairman requisitioned a list, called a certification, of eligible candidates from the HRD. In the years since *Castro* the HRD has delegated most of the responsibility for determining the eligibility of candidates to appointing authorities. See Ex. C (attached to this memorandum), A Certification Handbook: Entry Level Police Officer Appointments Subject to Civil Service (Castro v. Beecher), http:// www.mass.gov/Ehrd/docs//cs/publications/

entry—level—police—appointment—consent.doc [Certification Handbook], 6–7. As a result, the list generated by the HRD, Certification No. 961295,[3] included applicants who had passed the written exam, but whose overall eligibility for appointment had not yet been determined. (Dkt. No. 39, Ex. N, Personnel Administration Rules, PAR.07.) After receiving a certification, appointing authorities governed by the *Castro* decree, such as Defendant here, had to ensure that the candidates listed on the certification met the eligibility requirements. Ex. C., Certification Handbook, 6–7. Though candidates were subject to local review, the HRD retained oversight of the process to ensure compliance with its rules. Once final selections were made, appointing authorities had to submit an Authorization of Employment Form 14 ("Form 14") to the HRD for approval prior to the appointment of the selected candidates. *Id.* at 9.

Pursuant to the *Castro* decree, the HRD generated the initial certification list by merging a ranked list of all minority applicants and a ranked list of all non-minority applicants. The list alternated so that the name of one minority candidate was followed by the name of a non-minority candidate, which was in turn followed by the name of a minority candidate, and so on down the list. Each of the separate lists was made by taking all the members of one group, applying the relevant statutory preferences, and ranking the applicants by their exam score. The combined list sent to Defendant did not include the actual exam score of any applicant,[4] though instances where multiple applicants within

---

3. Two points about this list deserve clarification. First, in its previous order the court described the list generated by the HRD as containing the names of "those persons who had passed the most recent HRD examination and were eligible for permanent employment." (*Sullivan I* at 5.) To avoid potential confusion the court now clarifies that it did not mean to imply that the HRD had already established that the persons whose names were placed on the list met all the eligibility requirements. The court merely meant that those on the list had overcome the first eligibility hurdle by passing the written exam.

Second, Plaintiffs have described Certification No. 961295 as a 2n + 1 list. (Dkt. No. 28, Pls.' Mem. 3.) Defendant disputes this reference on the basis that the meaning of the term 2n + 1 is unclear. The term 2n + 1 is used by the HRD to describe the formula that limits the pool from which an appointing authority may make appointments. (Dkt. No. 39, Ex. N, Personnel Administration Rules, PAR.09.) N is the number of appointments being made and the rule allows the appointing authority to consider up to twice that number of candidates, plus one additional candidate.

Although the record contains a definition of the term 2n + 1, it is clear that Plaintiffs have misapplied the term to Certification No. 961295. A quick count reveals that the certification contained significantly more than the one hundred twenty one names that an appointing authority could consider when seeking to make sixty appointments. Candidates who did not sign the certification or who later indicated that they would not accept a position were not considered part of the 2n + 1 group, even though their names appeared on this certification. The record contains no explanation of how the 2n + 1 rule was or was not applied in this case, one of the many unexplained obscurities in this record.

4. The HRD does not include applicants' scores on certifications. Prior to 1995, the Collective Bargaining Agreement ("CBA") covering the Springfield Police Department stipulated that seniority be assigned based on applicants' scores on the written exam. (Dkt. No. 9, Ex. D, Arbitrator's Award 4 (quoting 7/1/91–6/30/94 CBA, 7.02).) The current method for assigning seniority, discussed below, was adopted after the city became unable to assign seniority based on exam scores. (*Id.* at 5.) Plaintiffs' memorandum at times appears to assume that the construction of the list necessarily meant that minorities with lower exam scores occupied higher positions on the list than higher-scoring non-minorities. No evidence of record supports this assumption.

one group had the same exam scores (whatever they may have been) are marked as ties. Thus there is no accurate way to compare scores between members of different groups. Significantly, though race obviously was a factor explicitly used to establish the 1996 certification, Plaintiffs have not alleged that the creation of Certification No. 961295 violated their constitutional rights.

Once Defendant received the certification, candidates were notified that they would need to sign the list in order to be considered for a position. The record before the court does not indicate which candidates, if any, were eliminated at this stage on the basis of their failure to appear and sign the certification.[5] After candidates had an opportunity to confirm their interest in being appointed, William Cochrane, then Commander of the Springfield Police Academy, and his staff began performing background checks on applicants, setting up applicant interviews with the Board of Police Commissioners, issuing conditional offers of appointment, and coordinating additional testing. The only information in the record about how this process was conducted comes from Cochrane's uncontested deposition testimony. Although *Sullivan I* recounted this process in some detail, it is now clear that an even more detailed review is warranted.

Cochrane and his staff first determined a target number of new officers by subtracting the number of cadets eligible to become officers from the total number of appointments to be made. (Dkt. No. 9, Ex. A, Cochrane Dep. 24:1–8.) They then conducted background checks of applicants and scheduled applicant interviews with the Board of Police Commissioners. (*Id.* at 14:11–22.) The background investigations were conducted to ensure that applicants met the civil service and HRD requirements for becoming police officers in Massachusetts. (*Id.* at 16:2–6.) Applicants were eliminated if they could not, for example, prove they possessed (or could obtain) a Massachusetts driver's license, or if they had felony convictions, or had lied about being city residents. (*Id.* at 15:13–24, 24:16–24.) The background investigations also looked at each applicant's work history and character. (*Id.* at 16:11–24.) Cochrane and his staff did not actually eliminate candidates on the basis of these background investigations, but they could often predict which applicants were likely to be eliminated following their interviews with the Board of Police Commissioners. (*Id.* at 14:23–15:1–4, 24:9–24.) Applicants who were not eliminated were given condi-

---

**5.** There is a form, 16II, that may exist and indicate which candidates did not appear to sign. (Dkt. No. 18, Ex. F, McNeely Dep. 48:5–19.) Neither party has provided this form to the court. Plaintiffs have provided the court with the Form 16II created in 1998 in reference to a different HRD list, Certification No. 970976. (Dkt. No. 9, Ex. G, Form 16II for Certification No. 970976.) Not only does the 1998 form not provide the court with any information about which candidates did not sign the 1997 list, it suggests that at that time the Form 16II did not in fact delineate which candidates signed the list indicating a desire to be appointed. On that 1998 form applicants are marked as either minority, non-minority, eliminated, or self-removed.

The self-removal tag appears next to several names marked as having been selected though not appointed, indicating that it did not refer to individuals who did not sign the list. The eliminated tag does not instruct the court as to the reason why a candidate was eliminated, unless candidates were only eliminated due to their failure to sign the list, an assumption the court is not prepared to make. As a result, the court has no information from which it, or a jury, could draw a reasonable conclusion about how many applicants were eliminated from consideration in 1997 because they did not sign to indicate their interest in being appointed. Again, this is another part of the confusion Plaintiffs have been unable to dispel from the record.

tional offers of employment. (*Id.* at 16:15–20.)

After a conditional offer was extended, an applicant would have to pass (a) a medical screening test administered by Defendant; (b) a physical abilities test, paid for by the applicant and administered by the HRD; and (c) a psychological screening test administered by Defendant. (*Id.* at 16:21–17:23.) Candidates could be eliminated based on the results of any of these tests. (*Id.* at 17:15–24.) Successful applicants were then placed on a list for admission to the police academy. (*Id.* at 17:21–18:2.)

Cochrane testified that his general target was to have half of the appointments go to minority applicants and half the appointments go to non-minority applicants. (*Id.* at 25:1–3.) Despite Cochrane's formulation of a general target, to comply with the *Castro* decree, there was never a "quota" for minority officers, as Plaintiffs claim. Quotas are set-asides of a certain number of positions for members of certain groups. While parity may have been a goal, the result in this case was quite different. Defendant did not rigidly ensure that half of the hires would be minorities. Indeed, as the court noted in its previous order, the information on Form 14 shows that in the spring of 1997 Defendant hired more than twice as many white officers as minority officers. Even if cadets are not counted, Defendant hired almost twice as many non-minority officers as minority officers.

Prior to the extension of conditional offers of employment, applicants were evaluated on a rolling basis. (*Id.* at 24:7–12, 25:1–12, 30:5–15.) Cochrane stated that he and his staff basically worked from two lists in an attempt to maintain parity. (*Id.* at 31:2–33:10.) If a minority candidate was eliminated, or expected to be eliminated, Cochrane and his staff would begin a background check on the next minority candidate; if a non-minority candidate was eliminated they would begin processing the next non-minority candidate. (*Id.* at 31:2–7.) The two lists were later dovetailed to create a new list which alternated between minority and non-minority names. (*Id.* at 32:8–20.) During his deposition Cochrane emphasized that the new list was created to comply with the *Castro* decree. (*Id.* at 28:14–17.) In addition, he expressed his belief that the Form 14 sent by Defendant to secure approval of the appointments from the HRD would have matched this dovetailed list. (*Id.* at 32:17–20.) However, as the court painstakingly detailed in its previous order, and even after accounting for the presence of cadets, the names of newly appointed officers do not alternate between one minority and one non-minority candidate, and there is no parity at all between minority and non-minority appointees. (Dkt. No. 9, Ex. E, HRD Letter and Form 14; *see also Sullivan I*, 8–11.)

Something happened; no one knows what. All that is clear is that Cochrane, in his deposition testimony, was simply incorrect in suggesting that the pertinent Form 14 contained equal numbers of minority and non-minority candidates. Form 14 is just not an example of the reconstituted list he described.

Plaintiffs now suggest that a new alternating list was created when conditional offers of employment were made, and that Form 14 was prepared from that list after several additional candidates had been eliminated based on the medical, physical abilities, or psychological testing. (Dkt. No. 28, Pls.' Memo. ¶¶ 15–21.) Plaintiffs' position is superficially plausible, but it is only one explanation for what might have happened, and is unsupported by the documentary evidence. Another possibility is that Defendant created a reordered list

that included only those individuals who had signed the certification and that was subsequently reordered only to the extent that eliminated candidates' names were removed. That list, rather than the initial list, would then have formed the basis for the Form 14. Such an approach would have been in keeping with rules promulgated by the HRD for appointing authorities covered by the *Castro* decree. Ex. C, Certification Handbook, 6. Finally, it is possible that both occurred. A reordered list may have been created after the signing period, then been broken apart into two lists, which were later recombined before the last several candidates were eliminated and the Form 14 was created.

Based on the available evidence, the court cannot be sure when Defendant created one or more reordered, one-for-one lists.[6] Plaintiffs suggest that Defendant created an alternating list when the conditional offers of employment were made; that race was not considered past that point; that some candidates were eliminated based on medical, physical abilities, or psychological testing; and that the Form 14 list was created by removing the names of eliminated candidates from the interim list. This suggestion is speculative but, as will be seen, even if the court assumes it is correct, Plaintiffs have failed to show any entitlement to a remedy.

b. *Assignment of Seniority.*

However created, Defendant used the Form 14 list to designate seniority through the assignment of badge numbers. The greater an officer's seniority, the lower the badge number. Section 7.02 of the collective bargaining agreement ("CBA") required that when multiple new officers were appointed and completed training on the same day, their badge numbers, and thus their seniority, would be "based in the order of the civil service list from which applicants [were] appointed."[7] (Dkt. No. 9, Ex. D, Arbitrator's Award 4 (quoting CBA language adopted in 1995).) This meant that the higher an applicant's name on the civil service list, the lower that applicant's badge number should be. Plaintiffs take the position that the CBA provision required that seniority be based on the initial list sent by the HRD, not the eventual Form 14.[8]

6. That the court finds itself having to make assumptions without record support about something as central to the case as when Defendant may have reordered the hiring list is yet another example of the confusion in the record. Not only have Plaintiffs failed to dispel this confusion, they have taken inconsistent positions about when the Form 14 list itself was created. In their memorandum in support of this motion Plaintiffs assert that one individual listed on the 1997 Form 14, José Diaz, did not complete the police academy in 1997 and then in the following paragraph they state that the Form 14 list showed "those officers who had graduated from the Academy and been selected for appointment." (Dkt. No. 28, Pls.' Memo. ¶¶ 16–17 (emphasis supplied).)

7. The applicable provision of the CBA was adopted in 1995. (Dkt. No. 9, Ex. D, Arbitrator's Award 4.) Previously, new officers were assigned seniority based on written exam scores. (*Id.*) As noted above, *supra* n. 4, actual scores did not appear on Certification No. 961295.

8. The outcome of related arbitration was premised on this same position; that use of the Form 14 rather than the original list provided by the HRD violated the collective bargaining agreement. The city does not appear to have disputed that interpretation of the relevant provision of the CBA, and the arbitrator assumed that Defendant should have been assigning seniority based on the original HRD list. Neither party has challenged this reading of the CBA here because the violation of the CBA is not before the court. If, however, the court were required to interpret the CBA, it is doubtful that it would agree that Defendant's method of assigning seniority based on the Form 14 violated the CBA.

The reader will recall that the original HRD list (of more than 121 candidates for the sixty available positions) contained equal numbers of minority and non-minority candidates, listed alternately, to comply with *Castro*. The uncontested facts are that seniority was, in fact, assigned based on the Form 14 list. Although it had its origins in the HRD list, the Form 14, for reasons no one can adequately explain, contained the names of far more non-minority candidates and exhibited no consistent alternate listing.

In 1997, the year Plaintiffs were appointed, the process through which the Form 14 list was created resulted by happenstance in these five Plaintiffs' names appearing lower on the Form 14 in relation to the names of certain minority applicants, though their names had been higher than those minority applicants on the original certification sent by the HRD. This repositioning was pure accident, not based on race. The capriciousness of this ranking is evidenced by the fact that the next year the result was reversed. (Dkt. No. 9, Ex. D, Arbitrator's Award 9.) It is undisputed that in the following year, 1998, had seniority been assigned based on the original list sent by the HRD, twelve minority officers and one non-minority officer would have received lower badge numbers (and greater seniority), while eighteen non-minority officers and one minority officer would have received higher badge numbers (and less seniority). (*Id.*) Despite the absence of any evidence of discriminatory intent, and no evidence whatsoever of consistent or inevitable discriminatory impact, Plaintiffs take the position that Defendant's failure to assign seniority based on the original, alternating HRD certification, and instead use the Form 14, violated both the *Castro* decree and the Equal Protection Clause.

### 2. *2003–2004.*

The effect of the 1997 assignment of badge numbers came home to roost when Defendant laid off approximately seventy-five officers during the first quarter of 2003. Non-disabled officers were laid off in the order of their badge numbers such that those with the highest badge numbers were laid off first. (Dkt. No. 9, Ex. B, Albano Dep. 12:18–16:21.) The layoffs impacted officers hired in 1997 and 1998. (Dkt. No. 9, Ex. D, Arbitrator's Award 7.) Plaintiffs were laid off during a two week period. Had the five Plaintiffs' badge numbers been assigned based on their positions on the original list sent by the HRD, rather than the Form 14, they would have been laid off at a later time and recalled somewhat earlier.

Around the time the layoffs occurred, the union raised concerns with Defendant about the way in which seniority had been assigned when officers were hired in 1997 and 1998. (Dkt. No. 9, Ex. D, Arbitrator's Award 8.) These concerns culminated in the arbitration referenced above. None of the Plaintiffs had any knowledge of how his seniority was determined until 2003. (Dkt. No. 18, Exs. A–E, Pls.' Affs.)

### III. *DISCUSSION*

As explained above, the purpose of the *Castro* decree was to increase the number of minorities hired by ensuring that minority applicants made up a certain proportion of the applicants considered for positions. In the case of Springfield, the decree required that one minority be considered for every non-minority. Plaintiffs do not object to this requirement in itself, nor do they claim that it violated their rights.

This case turns on two questions. First, was the Defendant's creation of a new alternating list during the hiring process in 1997 necessary to fulfill the requirements of the *Castro* decree, or did it in fact

exceed the scope of the decree and violate the Equal Protection Clause? Second, did Defendant's system for layoffs violate the Equal Protection Clause? As Defendant has again chosen not to contest the substantive facts before the court, the court's task is to apply the law to the facts established by the record, such as they are.

A. *Creation of the Interim List and Scope of the Castro Decree.*

■ With respect to the first issue, whether Defendant's creation of the interim, alternating list during the 1997 hiring process constituted a violation of the Equal Protection Clause, the court's task is complicated by two aspects of this case. First, though the reach of the *Castro* decree is clearly central to this case, neither party here was a party to that decree. Second, very significantly, Plaintiffs have not challenged the *Castro* decree itself, but rather argue that Defendant's actions somehow exceeded the scope of the decree. As this case has been formulated, Plaintiffs agree that if Defendant's actions necessarily flowed from its obligations under *Castro,* Plaintiffs are entitled to no remedy. In other words, a finding that Defendant's actions were within the scope of the *Castro* decree marks the end of the court's inquiry.[9]

Plaintiffs argue that with regard to Defendant's 1997 hiring process the requirements of the *Castro* decree were fulfilled when the HRD sent Springfield a list of applicants who had passed the civil service exam arranged so that the names of minority and non-minority candidates alternated. After assuming that the HRD satisfied the requirements of the *Castro* decree when it provided the initial, alternating certification to Defendant, Plain-

tiffs assert that further use of the minority/non-minority groupings was a *per se* violation of both the *Castro* decree and the Equal Protection Clause. An examination of law in this circuit reveals how unconvincing this assertion is.

■ In determining the scope of the *Castro* decree, the court looks to the framework the First Circuit provided for interpreting this type of consent decree in *Mackin v. City of Boston,* 969 F.2d 1273, 1276 (1st Cir.1992). In *Mackin* the First Circuit interpreted the *Beecher* consent decree, finding that it continued to govern hiring of firefighters until the racial make-up of the force was proportional to the racial make-up of the city. When interpreting the specific meaning of the decree, the court looked first to the language of the decree. Second, the court looked to the way the parties acted pursuant to the decree because "[f]ew things evidence a decree's meaning more persuasively than an immutable, decade-old pattern of past practice under the decree, consensually engaged in by all sides in the underlying litigation that produced the decree." *Id.* Finally, the court relied on its own common sense as to what the decree must have required in order to satisfy its underlying goal.

Turning first to the language of the consent decree, the court begins with the undisputed fact that *Castro* required the HRD to establish separate groups of minority and non-minority applicants who had passed the written exam and were "otherwise qualified for appointment on the basis of existing requirements." Ex. B, June 27, 1975 Consent Decree 1; *see also Castro III,* 365 F.Supp. 655, 660 (D.Mass.1973). As described above, the

---

9. Compliance with a consent decree may not always end the constitutional inquiry. *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). But no argument on this line of authority is offered here.

HRD provided appointing authorities with lists created by alternating the names of members of the two groups. Ex. B, June 27, 1975 Consent Decree 3. The decree also required that if an appointing authority bypassed a candidate in favor of another candidate lower on the list the director of the HRD was to "disapprove any [such] appointment unless the appointing authority [ ] furnished [ ] a written statement of the reasons for rejecting the appointment of any candidate higher on the list." *Id.* Any written statements were then to be provided to the *Castro* plaintiffs' attorneys and the bypassed candidate upon request. *Id.* The language requiring the HRD to reject bypass appointments recognized that appointing authorities, such as Defendant here, would play an important role in achieving the purposes of the *Castro* decree and directed the HRD to manage that role.

The second *Mackin* factor, the evolution of practices implementing *Castro,* also undercuts Plaintiffs. At first, the HRD determined the eligibility of applicants *before* placing their names on a certification. In other words, the HRD determined not only whether the applicant had passed the written examination, but *also* whether the applicant had passed physical fitness and medical examinations and whether the applicant met requirements "pertaining to citizenship, education, moral character, age, and height." Ex. A, April 23, 1971 Stipulation ¶ 114. This initial approach meant that little preliminary screening fell to municipalities. Fewer opportunities arose for individual applicants to be rejected once their names reached the municipality. As a result, the initial list provided by the HRD was closely related to the list of applicants actually appointed.

Over the decades the process has changed. HRD currently certifies names to appointing authorities *solely* based on written test scores. The appointing authority now has a much greater role in determining the eligibility of candidates. Thus, there are now many more opportunities for candidates to be eliminated after their names have been certified to the municipality. Moreover, two elements of eligibility, successful completion of medical and physical fitness tests, which were once determined before an applicant's name was submitted to a municipality, now are not determined until *after* a conditional offer of employment has been made.

The upshot of all this is self-evident. There is now a much greater chance that in any given year a significant number of applicants from one group will be eliminated from the initial HRD list. As a result, unless adjustments are made, a disproportionate number of members of one group would be hired before any additional members of the other group would be appointed. Sometimes this would affect minorities, sometimes non-minorities.

This is exactly what occurred here. By reformatting the original HRD list, Defendant was merely carrying out the purposes of the *Castro* decree, in exactly the same way that the HRD did in the early days of the decree's implementation. There was no violation of the decree and certainly no actionable discrimination.[10]

Finally, the third *Mackin* factor, common sense, cuts against Plaintiffs here. From the time it was entered, the success of the *Castro* decree depended on the cooperation of appointing authorities. The decree required the HRD to exercise its authority to ensure their cooperation.

---

10. Even if this practice might have theoretically produced discrimination, which it did not, there was no discrimination in the for-

mulation of the 1997 Form 14 *in fact,* since it actually favored non-minorities overwhelmingly.

Over time, the level of cooperation required from appointing authorities has grown because the HRD has delegated more eligibility determinations. The lists sent by the HRD no longer represent the pool of eligible candidates that a municipality is to consider. The HRD has promulgated a guide and provides specific advice to appointing authorities to facilitate their cooperation. *See* Ex. C, Certification Handbook. Common sense dictates that when an appointing authority, such as Defendant here, takes on tasks which the *Castro* decree contemplated being done exclusively by the HRD, they bring themselves within the decree.

For all these reasons, Defendant's hiring process simply did not exceed the scope of the *Castro* decree.

## B. *Defendant's System for Layoffs.*

█ Plaintiffs rely on *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), to assert that "the Supreme Court has expressly held that even where a governmental entity is under a remedial decree to hire more minority employees, it *cannot* require that layoffs based on seniority be altered in order to prevent minority employees from being laid off in disproportionate numbers." (Dkt. No. 28, Pls.' Memo., 17). While Plaintiffs' description of *Stotts* is accurate, *Stotts* is inapplicable here because Defendant did not take race-based action at the time of the layoffs in violation of its own *bona fide* seniority system. The uncontradicted deposition testimony of Officer Peter Albano, the officer who assembled the layoff list, is clear that he used only the badge numbers in the police roster to make the list without regard to race.

Plaintiffs attempt to analogize this case to *Stotts* by equating the initial assignment of seniority with the type of alteration of the seniority system the Court dealt with in *Stotts*. However, Defendant's actions are distinguishable in important ways. In *Stotts* the lower court *amended* a consent decree to prevent all recent hires, a group which included a much higher percentage of minorities than the fire department as a whole, from being laid off before at least some more veteran firefighters, a group which was disproportionately white, were laid off. Such action deprived individual officers of the earned benefits of their seniority, solely because of their race. In this case, Plaintiffs cannot claim that race was used at the time of layoffs to deprive Plaintiffs of the earned benefits of their seniority. Plaintiffs' only legitimate complaint is with the initial hiring decision, which, for the reasons set forth above, is beyond challenge.

## IV. CONCLUSION

For the reasons discussed above, Plaintiffs' Motion for Summary Judgment (Dkt. No. 27) was DENIED, Defendant's Motion for Summary Judgment (Dkt. No. 35) was ALLOWED, and Plaintiffs' Motion to Strike Defendant's Motion for Summary Judgment was DENIED.

The Clerk is ordered to enter judgment for Defendant; this case may now be closed.

It is So Ordered.