# United States Court of Appeals
## For the First Circuit

Nos. 12-2227, 12-2228

PRUCO LIFE INSURANCE COMPANY,

Plaintiff, Appellee,

v.

WILMINGTON TRUST COMPANY, Trustee under the Paul E. L'Archevesque
Special Revocable Trust-2006; JAY L'ARCHEVESQUE, Co-Trustee under
the Paul E. L'Archevesque Special Revocable Trust-2006,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

F. Warren Jacoby, with whom Cozen O'Connor, Mary Cavanagh
Dunn, and Blish & Cavanagh LLP were on brief, for appellant
Wilmington Trust Company.
Robert M. Duffy, with whom Stacey P. Nakasian and Duffy &
Sweeney, Ltd. were on brief, for appellant Jay L'Archevesque.
Laurie E. Foster, with whom Allyson N. Ho, Morgan, Lewis &
Bockius LLP, Robert C. Shindell, Angela L. Carr, and Taylor Duane
Barton & Gilman, LLP were on brief, for appellee.

June 28, 2013

**LYNCH, <u>Chief Judge</u>**.  Wilmington Trust Company and Jay L'Archevesque, co-trustees of the Paul E. L'Archevesque Special Revocable Trust-2006, challenge the district court's grant of summary judgment to Pruco Life Insurance Company on Pruco's claim for a judgment of mutual rescission of a life insurance policy, owned by the trust, on the life of Paul L'Archevesque.

This case turns on a limited set of material facts. Pruco sought rescission of the policy after it discovered that the policy application had contained material misrepresentations about the health of the insured.  It tendered to Wilmington a check in the amount of the policy premiums paid (plus interest), along with a letter clearly stating that the purpose of the check was to effect rescission of the policy.  Under the trust agreement, Wilmington had ceded decisionmaking authority to Coventry Capital I LLC, a premium financing company, which was acting as the servicing agent for a bank that had taken a security interest in the policy. Wilmington accordingly forwarded the check and the letter to Coventry, and after three weeks of investigation and consultation with in-house counsel, Coventry sent the check back to Wilmington with instructions to cash it.  Wilmington did so.  At no time before or since has anyone attempted to return the money to Pruco.

Under these circumstances, the district court concluded that, as a matter of law, a mutual rescission had taken place, and Pruco was entitled to a judgment declaring the policy void <u>ab</u>

initio.  In an effort to avoid this conclusion, Wilmington and Jay L'Archevesque raise a series of arguments that attempt to obscure the relevant facts.  We reject these arguments and affirm the district court's judgment.

I.

In the fall of 2005, on the advice of his accountant, Paul L'Archevesque met with an insurance broker, Vincent Passananti, to discuss purchasing a life insurance policy. Passananti explained to Paul[1] that he could purchase this insurance using non-recourse premium financing: Paul would take a loan to pay the premiums, and when the loan matured he could sell the policy on the open market, using the proceeds to pay off the loan and retaining any excess proceeds for himself.  Paul testified that his intention was to sell the policy after about two years.

To obtain the loan, Passananti submitted Paul's medical records to Coventry, a company with which Passananti had a contract to produce premium financing transactions.  At least one of these records noted that Paul had been experiencing some memory loss. After conducting its own medical underwriting, Coventry approved the premium financing on January 4, 2006, and arranged for a loan through LaSalle Bank.

---

[1] Since Jay and Paul L'Archevesque share the same last name, this opinion will refer to them by their first names.

Later that month, Paul created two trusts that would be used to take out the premium finance loan and eventually hold the life insurance policy. The first was the Paul E. L'Archevesque Special Trust-2006, of which Jay was the sole trustee. The second was the Paul E. L'Archevesque Special Revocable Trust-2006, of which the first trust was the settlor and Jay and Wilmington were co-trustees. Wilmington is a professional trust company that acts as trustee for approximately 800 trusts in connection with Coventry's premium finance loans. The two trusts and Wilmington then entered into a supplement to the trust agreement, which provided, inter alia, that Wilmington would create a sub-trust to enter into the loan agreement with LaSalle.

The sub-trust agreement provided that Jay and Wilmington would perform their duties as trustees at the direction of LaSalle or its designees for the duration of the loan. The note and security agreement between the sub-trust and LaSalle stated that Coventry would act as LaSalle's servicing agent and confirmed that Jay and Wilmington would follow Coventry's instructions until LaSalle decided otherwise. Further, Jay and Paul each signed a power of attorney designating Coventry as his attorney-in-fact for purposes of, respectively, the sub-trust and the life insurance policy.

Meanwhile, Passananti began making inquiries on Paul's behalf to a number of life insurance companies, including Pruco.

He sent an informal inquiry to Pruco on January 24, 2006. Pursuant to a HIPAA authorization signed by Paul, Passananti also gathered and sent Paul's medical records to Pruco and other insurers. The parties vigorously contest which medical records were sent to Pruco and when. It is at least common ground, however, that at no time before or during its underwriting process did Pruco receive a copy of an earlier letter from a neurologist to Paul's primary care doctor, dated January 11, 2006, which stated that the neurologist believed Paul had "[p]robable mild Alzheimer's disease" and that Paul had been given a medication, Razadyne ER, used to treat Alzheimer's disease. It is uncontested that Paul actually received this medication. Further, the inquiry Passananti sent to Pruco included a medical exam report that also did not mention memory loss or Alzheimer's disease. While the records that Pruco undisputedly received did show that Paul had at times complained of depression and dizziness, they did not reflect any probable or actual diagnoses that Pruco would consider "materially adverse" health conditions. Alzheimer's disease or other forms of dementia would have been considered material.

Based on the information it had received, Pruco issued a tentative offer of life insurance, subject to the receipt of additional items, including a formal application. On February 16, 2006, Paul, through Passananti, submitted an application to Pruco for a $10 million life insurance policy (an amount that was later

increased to $15 million). The application contained a number of yes-or-no questions about the insured's medical history; Paul instructed Passananti to "mark 'No' on everything." The parties do not dispute that some of these "no" answers constituted misrepresentations. Specifically, Paul answered "no" to the question of whether he had "been diagnosed with or treated for . . . any disorder of the brain or nervous system," even though he had recently complained of memory problems and received a diagnosis of "[p]robable mild Alzheimer's disease" along with medication to treat that condition. He also answered "no" to the question of whether he was "currently taking any prescription medications," even though he had been given the Razadyne.

On March 7, 2006, Pruco issued a $15 million policy on Paul's life. The policy was issued to Jay as trustee of the Special Trust-2006. Wilmington, as co-trustee of the Special Revocable Trust-2006, was added as an owner and beneficiary of the policy on March 21, 2006. LaSalle then took a security interest in the policy as collateral for its premium finance loan.

Approximately a year and a half later, in the fall of 2007, Pruco received an inquiry from Coventry relating to the policy. This inquiry suggested to Pruco that Paul intended to sell the policy, which raised the underwriting manager's suspicion that "something else was going on" with Paul's health. Pruco then ordered Paul's updated medical records, which revealed the

previously undisclosed information about Paul's memory loss, "[p]robable mild Alzheimer's" diagnosis, and Razadyne prescription. After reviewing the records, Pruco concluded that Paul had made material misrepresentations about his health and that these misrepresentations constituted grounds for rescinding the policy.

On February 5, 2008, Pruco sent Wilmington a letter and a check for $845,964.60. Pruco also copied the letter to Paul, and Jay learned about the letter from conversations with Paul's financial advisors. The letter stated, in pertinent part:

> We recently received information about [Paul]'s medical history that was not disclosed on the application for insurance dated February 16, 2006 . . . . If we had known this information at the time of application, we would not have issued the Policy. We are writing to inform you that the Policy is not in force and is void as of the Policy's contract date of March 7, 2006. We have enclosed with this letter [Pruco]'s check . . . payable to you in the amount of $845,964.60 as the return of the total amount of premiums, including interest, paid under the Policy.

The letter went on to detail the representations Paul had made in the application that were contradicted by the recently obtained medical records, and it stated that Pruco was accordingly entitled "to rescind the Policy on the grounds of material misrepresentation."

As soon as it received the rescission letter, Wilmington forwarded both the letter and the check to Coventry along with a request for instructions. Coventry's in-house counsel then began

assessing the situation, including by contacting Passananti and Jay and by deliberating with another Coventry attorney and Coventry's Chief Executive Officer. Coventry also already had in its possession various medical records of Paul's that it had received in the course of its underwriting process for the premium finance loan. Coventry's corporate representative testified that the company did not assume the truth of the statements in Pruco's letter when deciding whether to agree to rescission, but rather relied on the assessment of its in-house counsel.

On February 27, 2008, Coventry returned the check to Wilmington with instructions to deposit it. The next day, Wilmington deposited the check into the account of the Special Revocable Trust-2006, then wired the funds from that account to LaSalle Bank. At no time did Coventry, Wilmington, or Jay inform Pruco that the Special Revocable Trust-2006 did not agree to rescission or did not intend to accept rescission by depositing the check.[2]

II.

Pruco filed a complaint in the Rhode Island federal district court on February 29, 2008, invoking the court's diversity jurisdiction. The complaint sought rescission of the policy and a

_____

[2] Wilmington and Jay later made such an assertion in their pleadings in this litigation, but there is no record evidence to indicate that either of them made any such statement to Pruco contemporaneously with the receipt, investigation, or cashing of the premium refund check.

declaration that the policy was void <u>ab initio</u>, on the basis that Paul had made material misstatements in his application, which induced Pruco to issue the policy. Pruco later amended its complaint to add a claim for a declaration that mutual rescission had been effectuated by Wilmington's acceptance of the returned premiums, as well as a claim for rescission for lack of an insurable interest, based on the allegation that the true beneficiary of the policy was a third-party investor with no insurable interest in Paul's life. The first amended complaint named Wilmington and Paul as defendants; Pruco amended its complaint a second time to name Jay as a defendant. Paul later filed a motion to dismiss the claims as to him on the ground that he was not an owner or beneficiary of the policy. The district court granted this motion on May 19, 2009.

After discovery, the parties cross-moved for summary judgment.[3] On September 7, 2012, the district court issued an opinion and order granting summary judgment to Pruco on its claim for mutual rescission and denying Wilmington's and Jay's motions for summary judgment. Citing the seminal Rhode Island case on mutual rescission, <u>Klanian</u> v. <u>New York Life Insurance Co.</u>, 26 A.2d 608 (R.I. 1942), the district court determined that the undisputed

_____

[3] In its motion for summary judgment, Pruco offered to stipulate to the dismissal of its claim for rescission based on lack of an insurable interest. In its ruling on the summary judgment motions, the district court did dismiss this count, and no party challenges that ruling on appeal.

facts compelled the conclusion that a mutual rescission had occurred as a matter of law. Pruco had tendered the premium refund check with a letter explicitly stating that the check was for the purpose of rescission, using language common in mutual rescission cases. Coventry had considered the offer for three weeks and then directed Wilmington to cash the check, and Wilmington did so. After cashing the check, no party had expressed any intention not to rescind, and there had never been an offer to return the refund to Pruco.

In the face of these facts, the district court held that Wilmington's and Jay's mere assertions of their subjective intent not to rescind were immaterial. The court also rejected the argument that any agreement to rescind was invalid because Pruco had, it was alleged, obtained the rescission by fraud. The undisputed facts demonstrated that Coventry, a sophisticated party in the insurance industry, had independently assessed the situation and consulted with counsel, and had not assumed the truth of the statements in Pruco's letter. As such, there was no genuine issue of material fact as to whether Coventry had relied at all, let alone justifiably relied, on Pruco's alleged misrepresentations.

Judgment on the district court's order entered on September 10, 2012, and Wilmington and Jay each timely appealed. Their appeals are consolidated before us.

III.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review a district court's grant of summary judgment de novo, "drawing all reasonable inferences in favor of the non-moving party while ignoring 'conclusory allegations, improbable inferences, and unsupported speculation.'" Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 325 (1st Cir. 2009) (quoting Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009)). We may affirm on any basis apparent in the record. Id. On an appeal from cross-motions for summary judgment, the standard does not change; we view each motion separately and draw all reasonable inferences in favor of the respective non-moving party. See OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012).

On appeal, Wilmington and Jay offer different but often overlapping arguments for overturning the district court's decision. Wilmington first argues that the district court misinterpreted Rhode Island law and improperly relied on out-of-state law regarding the standard for mutual rescission. It then argues that there are genuine issues of material fact concerning whether Pruco made material misrepresentations in its rescission

letter, which should have precluded summary judgment.[4] Jay likewise argues that there are genuine issues of material fact for trial, but he frames his argument as addressing Pruco's allegedly "bad faith" conduct, which Jay contends should equitably bar Pruco from obtaining a rescission. We take each argument in turn.

A.        <u>Rhode Island Mutual Rescission Law</u>

"Rescission is . . . [an] abrogation or undoing of [a contract] from the beginning. It seeks to create a situation the same as if no contract ever had existed." <u>Dooley</u> v. <u>Stillson</u>, 128 A. 217, 218 (R.I. 1925). In <u>Klanian</u>, the Rhode Island Supreme Court stated that "[m]utual rescission rests upon intention; it depends both upon the acts of the parties and the intention with which those acts are done." 26 A.2d at 613. While the question of intention to rescind is "ordinarily a question for the jury, . . . it may become a question for the court where the facts are admitted or clearly established." <u>Id.</u> Here, the facts surrounding the cashing of the premium refund check were undisputed, with the only difference among the parties being the appropriate inferences to draw from those facts.

---

[4] Wilmington also argues, in the alternative, that any rescission was based on a mutual mistake of fact that renders the agreement voidable. This argument appears to be premised on the unsupported theory that Pruco itself was mistaken as to the alleged falsity of the statements in the rescission letter. Besides being unrelated to record evidence and making little sense, this argument would fail for the same reasons explained below as to Wilmington's assertion that Pruco deliberately made misrepresentations in the rescission letter.

As in <u>Klanian</u>, the insurance company here sent a letter to the policyholder clearly stating its intent to rescind the policy and including a check tendering the premiums paid, with interest. <u>See</u> <u>id.</u> at 609-10. As in <u>Klanian</u>, the recipient here cashed the check. <u>See</u> <u>id.</u> at 610. The <u>Klanian</u> court stated that these facts raised a "reasonable inference" of mutual rescission. <u>Id.</u> at 613. The difference between <u>Klanian</u> and this case is that, in the former, the policyholder was illiterate and did not understand the contents of the letter or the notation on the tendered check. <u>Id.</u> at 610. When he learned what the letter said, he immediately dictated a response letter to the insurer stating that he had not intended to agree to rescission and offering to return the refunded premiums. <u>Id.</u> Days later, his counsel sent the insurer a check in the amount of the premiums. <u>Id.</u> Under these circumstances, the court determined that there was a jury question as to the policyholder's intent to rescind. <u>Id.</u> at 613.

Wilmington argues that <u>Klanian</u> stands for the proposition that, if a party has an unexpressed, subjective intent not to rescind, then that intent can defeat a claim of mutual rescission. This is not an accurate reading. Indeed, the <u>Klanian</u> court stated that, were it not for Klanian's prompt letter and attempt to return the refund, there would have been "merit in the [insurer]'s contention that there was nothing to go to the jury and that [the insurer] was entitled to a direction of a verdict as a matter of

-13-

law." Id.; see also Reccko v. Criss Cadillac Co., 551 A.2d 20, 21-22 (R.I. 1988) (finding jury issue on intent to rescind where plaintiff had sent letter to defendant stating that she was making an "offer in mitigation of damages" that should not "be interpreted as a[] . . . rescission").  The Klanian court also specifically distinguished Klanian's situation from those in other cases holding that a mutual rescission had occurred based on the tender and cashing of a refund check, on the grounds that the other cases had involved policyholders who waited a significant amount of time before cashing the check and thereafter offered no evidence to overcome the inference of an intent to rescind.  See 26 A.2d at 612-13 (citing Kincaid v. N.Y. Life Ins. Co., 66 F.2d 268 (5th Cir. 1933); Warren v. N.Y. Life Ins. Co., 58 P.2d 1175 (N.M. 1936); Peterson v. N.Y. Life Ins. Co., 240 N.W. 659 (Minn. 1932)). Klanian never suggests that a party's unexpressed intentions, evidenced by nothing more than that party's bare, post hoc assertions, can overcome the inference of mutual rescission.  Cf. Newport Plaza Assocs. v. Durfee Attleboro Bank (In re Newport Plaza Assocs.), 985 F.2d 640, 643-44, 646 (1st Cir. 1993) (noting that, under Rhode Island law, "[c]ontracts ordinarily depend on objective indicia of consent, not on a party's subjective expectations").

Here, of course, Wilmington did not take any actions either before or after it cashed Pruco's refund check to indicate

-14-

that it did not intend to agree to rescission.[5] Wilmington does not point to any record evidence showing that it ever expressed any dissent to Coventry or to Pruco. Nor does it present any evidence to support a finding that Coventry had any intent other than to agree to rescission when it instructed Wilmington to cash the check. Cf. Dooley, 128 A. at 218 ("An implied rescission is as effective as an express one."). To this day, Wilmington has never attempted to return the premiums to Pruco. These facts are undisputed, and Wilmington's bare assertions are not enough to overcome the reasonable inference that a mutual rescission took place.

The out-of-state cases cited by the district court support this result, and none of them are in conflict with Rhode Island law. In fact, the case at which Wilmington aims the brunt of its attack -- Avemco Insurance Co. v. Northern Colorado Air Charter, Inc., 38 P.3d 555 (Colo. 2002) -- cites Klanian for the very proposition that "in order to overcome the inference of rescission, the insured must offer evidence, beyond a subjective intent not to rescind, to rebut the acts of the insurer and the

---

[5] That Wilmington was taking instructions from Coventry does not change the situation. It is undisputed that Wilmington had agreed to act at Coventry's direction for all matters relating to the policy for as long as the premium finance loan was outstanding. The fact that Coventry directed Wilmington to act in a manner that Wilmington now claims was against its preferences has no effect on the rescission analysis.

insured." Id. at 563. Wilmington's argument that the district court ignored Rhode Island law is without merit.

B.          Relevance of Pruco's Alleged Misrepresentations

Wilmington next argues that, even if cashing the refund check raises an inference of an agreement to rescind, there were genuine issues of material fact that should have precluded the conclusion, at the summary judgment stage, that such an agreement was valid. Specifically, Wilmington argues that there were material factual disputes as to whether Pruco made misrepresentations in its rescission letter concerning what Pruco knew about Paul's medical condition and the extent to which Pruco had relied on the statements in Paul's application. Wilmington suggests that Pruco made these misrepresentations in order to fraudulently induce rescission; if so, Wilmington says, the agreement to rescind is voidable.

As the district court correctly concluded, regardless of whether the statements in the letter were accurate as to Pruco's knowledge of Paul's medical condition, the undisputed facts reveal that Coventry did not rely on these statements in reaching its decision to consent to rescission. Coventry is a sophisticated entity that had the advice of in-house counsel on this matter. The decisionmaking process involved Coventry's CEO. Coventry had possession of Paul's medical records and had performed its own underwriting, so it had no need to rely on Pruco's characterization

of the records; indeed, Coventry's representative explicitly testified that it did not assume the truth of Pruco's statements. Coventry contacted Passananti for additional information[6] and considered its options for approximately three weeks. Based on all of its information and advice, Coventry decided to instruct Wilmington to cash the check, and Wilmington was obligated to follow that direction.

Under these circumstances, any dispute about the truth of Pruco's statements in the letter cannot be considered material to the outcome of this case. No reasonable jury could have concluded that Coventry relied, let alone justifiably relied, on Pruco's statements in reaching its decision to instruct Wilmington to cash the check.

Nor is the issue of Pruco's reliance on the statements in Paul's application material to the outcome here. Wilmington's argument goes to Pruco's cause of action for <u>unilateral</u> rescission,

---

[6] We reject the argument, advanced by both Wilmington and Jay, that Passananti was acting as an "agent" of Pruco (and thus, presumably, that he should be treated as part of the alleged fraud). The record is clear that Passananti had contractual relationships with both Pruco and Coventry but was an employee of neither. Further, Passananti's non-exclusive contract with Pruco only granted him the authority to "solicit, procure and submit applications for Policies," along with limited related duties; he was specifically barred from, inter alia, "mak[ing] representations as an agent of [Pruco] in any manner or for any purpose except as specifically authorized" by the contract. Neither Wilmington nor Jay points to any record evidence showing that Passananti made any statements to Coventry at Pruco's direction or request, or that any statements Passananti made were "specifically authorized" by his Pruco contract.

which included an allegation that Pruco had relied on the truth of the statements in the application when deciding whether to issue the policy. Pruco's cause of action for mutual rescission did not contain, nor was it required to contain, such an allegation. The district court resolved the case on the mutual rescission count, as do we.

Wilmington attempts to argue -- although not very clearly -- that Pruco could not have obtained a mutual rescission if it was not entitled to a unilateral rescission. But in Klanian, the Rhode Island Supreme Court noted that the question of whether a party to a contract has a valid right to rescind is relevant only "in the case of a unilateral rescission claimed as of right by the rescinding party," not "in a case of mutual rescission." 26 A.2d at 613. The court expressly rejected the argument that there could not have been a mutual rescission because the terms of the policy would have prevented unilateral rescission (specifically, because the contestable period had expired). See id.

This reasoning alone supports the district court's decision, without needing to address the merits of Wilmington's factual allegations. Even if the facts here are disputed, they are not material. Once Coventry and Wilmington took the steps to effect a mutual rescission, Pruco's independent right to rescind ceased to be legally relevant.

C.        "Bad Faith"

Jay argues that there were genuine issues of material fact for trial regarding whether Pruco's offer to rescind was made in bad faith, and that if Pruco did act in bad faith, it would have been equitably barred from obtaining the remedy of rescission.  He asserts that the district court erred in finding these arguments irrelevant to the rescission analysis.  We agree with the district court.

First, many of Jay's arguments nominally based on "bad faith" are functionally identical to Wilmington's arguments concerning whether Pruco had a right to unilateral rescission. Regardless of the label Jay places on these arguments, the result is the same.  As we have explained, the uncontested evidence shows that Coventry did not rely on the statements in the rescission letter when it considered whether to agree to rescission.  Thus, even if Jay were correct that there was a genuine factual dispute as to whether Pruco acted in bad faith by making the statements in the letter -- and we express no opinion on that point -- the dispute would not be material.  The same goes for Jay's allegations that Pruco acted in bad faith by asserting that it had a right to unilateral rescission.  Whether or not Pruco believed in good faith that it had such a right, the question is not material where mutual rescission occurred as a matter of law.

Second, Jay offers no Rhode Island law supporting his theory that an insurer acts in "bad faith," and that any agreed-upon mutual rescission is therefore void, if the insurer offers to rescind an insurance contract when the insurer (allegedly) could not have obtained unilateral rescission. The only authority Jay cites for this proposition is a Minnesota case, based on Minnesota precedent, which has never been cited by a Rhode Island court. See Kilty v. Mut. of Omaha Ins. Co., 178 N.W.2d 734 (Minn. 1970). And in any event, the case is distinguishable. In Kilty, the Minnesota court noted that there was no evidence of misrepresentation in connection with the insured's application, which raised a factual question as to whether the insurer had "procur[ed] consent to the rescission" by fraud or bad faith. Id. at 736. Here, by contrast, Paul undisputedly misrepresented his medical history in his application, and Coventry's agreement to the mutual rescission was not induced by any of the allegedly bad-faith statements in the rescission letter.[7] Even if the Rhode Island courts were to require an insurer to have a good-faith basis for believing that it

_____

[7] Moreover, the insurance company in Kilty did not seek a declaration of rescission before the insured had made a claim for benefits. See 178 N.W.2d at 736. Here, Pruco began investigating the possibility of rescission not when a claim was made on the policy, but when it received information suggesting that the policy was designed to be sold on the open market. As Pruco's counsel explained at oral argument, life insurance policies are more valuable on the market when the insured has health problems, because that means the buyer will likely recoup its investment sooner.

-20-

could obtain a unilateral rescission in order to make an offer for mutual rescission (and we do not assume they would), no reasonable jury could have concluded in this case that Pruco lacked even an arguable basis for seeking rescission of the policy. Paul admittedly made misrepresentations about his being diagnosed with and treated for a degenerative brain disease, and the medical records that Pruco received omitted any documentation of this fact.

Jay's reliance on general principles of equity is unavailing under these circumstances. The implied covenant of good faith and fair dealing and the "clean hands" doctrine simply are not relevant here. Where it was Paul who originally misrepresented his medical history in order to obtain a $15 million life insurance policy, Jay cannot be heard to complain that Pruco came to court with unclean hands.[8]

Finally, Jay argues that there is a genuine dispute of material fact concerning whether Pruco acted in bad faith because it did not attach Paul's application to the original policy, and thus would not have been entitled to rescind based on any statement in the application. There are at least three problems with this

---

[8] Jay's argument based on Rhode Island statutory law is also misplaced. As Jay himself admits, the statute he relies on, R.I. Gen. Laws § 27-4-10, does not apply to claims for rescission made by the insurer while the insured is alive. See Prudential Ins. Co. of Am. v. Tanenbaum, 167 A. 147, 149-50 (R.I. 1933). Paul was still alive when Pruco filed the instant suit. The fact that Pruco sought rescission while Paul was alive, rather than after his death, certainly is not evidence of bad faith.

argument.   First, Jay admitted in his answer to Pruco's second amended complaint that the application was attached to the policy.[9] "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding."  Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992) (quoting Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523, 528 (2d Cir. 1985)) (internal quotation marks omitted).   Second, Jay states that Coventry is in possession of the original policy, so Coventry would have had an opportunity during its three-week investigation to find out whether the application was attached to the policy and to decide what, if any, weight to give that fact in reaching its decision to agree to rescission.   Third, as explained above, Klanian forecloses the argument that, in order for a mutual rescission to be effective, a policy must by its terms authorize a unilateral rescission.   See 26 A.2d at 613.   Thus, even if the first two problems were not present, Jay's argument would be legally irrelevant.

IV.

The judgment of the district court is affirmed.

---

[9] Jay argues in his reply brief that his reference to an "application" in his answer did not refer to the particular application he now contends was absent.  This is a strained reading of the pleadings, and regardless, his general argument fails for the additional reasons explained in the text.